J-A29015-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.W. | : | No. 460 WDA 2022 |

Appeal from the Order Entered March 24, 2022
In the Court of Common Pleas of McKean County Civil Division at No(s):
CP-42-CD-491-2009

BEFORE:  BENDER, P.J.E., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BENDER, P.J.E.:           **FILED; January 26, 2023**

J.C. (Mother) appeals from the March 24, 2022 order that awarded Mother and B.W. (Father) joint legal custody with Mother having physical custody on weekdays and Father having physical custody three weekends per month of their son, B.C-W. (Child), born in August of 2008.  After review, we affirm.

In its Opinion and Order issued on March 24, 2022, the trial court provided the background of this matter, stating:

> The parties are the natural parents of B.C-W., age thirteen (13).  This matter commenced with [Mother's] Amended Petition for Emergency Relief, filed August 11, 2021, which was treated as a Petition to Modify Custody by Order dated October 21, 2021.  On August 16, 2021, [Mother] filed a Petition for Appointment of [a] Guardian *ad litem* (GAL), which the [c]ourt denied.[1]  On October 26, 2021, with the agreement of both parties, the [c]ourt [o]rdered a custody evaluation and appointed Dr. Robert Maiden as Custody Evaluator.

<sup></sup>¹ On October 1, 2021, [Mother] filed a Motion for Reconsideration requesting the [c]ourt reconsider[] appointing a GAL, which the [c]ourt denied following a hearing on October 12, 2021.

On November 30, 2021, [Father] filed a Petition for Civil Disobedience of Custody Order, alleging that [Mother] was withholding custody and that he had not seen B.C-W. since July 2021, in violation of the parties' existing Custody Order filed November 23, 2010, and in violation of the [c]ourt's October 21, 2021 Order. A hearing was held on the Petition on January 7, 2022. It was undisputed that [Father] had not exercised a period of physical custody since July 2021, despite numerous [c]ourt [o]rders directing the parties to comply with their Custody Order. [Mother] argued that B.C-W. refused to go to [Father's] periods of custody and that she could not force him. The [c]ourt deferred decision on the Petition for Civil Disobedience and issued an Interim Order to ensure [Father] received at least some periods of custody until the parties' custody trial.

The parties are currently following an Interim Custody Order dated January 10, 2022. Under its terms, the parties share legal custody and [Father] has periods of custody two (2) times per week for a period of three (3) hours. Also on January 10, 2022, the [c]ourt issued an [o]rder appointing legal counsel for B.C-W., denying [Mother's] Second Motion to Appoint a Guardian *ad litem*, and scheduling an expanded custody trial, among other things.

Argument on all other outstanding motions was held on February 10, 2022, including argument on [Mother's] Motion to Disqualify [Father's] counsel, which the [c]ourt denied. An expanded custody trial was ultimately held on March 3, 2022, and March 4, 2022.

Trial Court Opinion and Order (TCOO), 3/24/2022, at 1-2. In the TCOO, the court set forth findings of fact, a complete list of exhibits, and a list of all the witnesses that testified at the March 2022 custody trial. The TCOO also contained a discussion directed at all sixteen custody factors, identified in 23 Pa.C.S. § 5328(a), and a detailed custody schedule.

Mother then filed this appeal.[1]  She also filed a seven-page Pa.R.A.P. 1925(b) Concise Statement of Errors Complained of on Appeal that contained twelve issues with the second issue listing twelve sub-issues.  Despite this extensive Concise Statement, Mother's brief only states the following two issues:

1. Whether the trial court abused its discretion in failing to modify the parties' current custody order based upon substantial and credible evidence that contact between [Father] and [C]hild was not in the best interests of the [C]hild?

2. Whether the trial court abused its discretion in granting the [Father's] Petition for Civil Disobedience of a Custody Order when there was no evidence upon which the [c]ourt could find that the [Mother] possessed the requisite intent to be held in contempt?

Mother's brief at 32.

The relevant scope and standard of review in custody matters are as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion.  We must accept findings

---

[1] We note that the order from which Mother appeals directs that a status conference would be held in June of 2022.  Despite the scheduling of the status conference, we conclude that the March 24, 2022 order constitutes a final and appealable child custody order because no custody claims are outstanding. **See** Pa.R.A.P. 341(b)(1) (a final order is any order that "disposes of all claims and of all parties"); **see also G.B. v. M.M.B.**, 670 A.2d 714 (Pa. Super. 1996) (a custody order is final and appealable after the trial court has concluded its hearings on the matter and the resultant order resolves the pending custody claims between the parties).  It is apparent that the trial court scheduled the status conference to review compliance with the March 24, 2022 order rather than because there were any claims outstanding.

of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

Furthermore, we note that:

> The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.
>
> *Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

*A.H. v. C.M.*, 58 A.3d 823, 825 (Pa. Super. 2012). Moreover, "[w]hen a trial court orders a form of custody, the best interest of the child is paramount."

*S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted).

As noted above, the trial court issued the TCOO on March 24, 2022, following the custody trial. Then, after Mother filed her appeal and her Concise Statement, the trial court filed an opinion to comply with Pa.R.A.P. 1925(a), providing the facts, referencing the standard of review, and directing answers

and analyzing all of Mother's issues set forth in her concise statement. *See* Trial Court 1925(a) Opinion, 5/9/2022.

Essentially, Mother's arguments are requesting that this Court re-find facts and re-weigh the evidence presented. However, our standard of review does not permit us to function in this manner. Rather, our standard of review requires that we "accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations." *C.R.F., III v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012). Moreover, we "may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." *E.D. v. M.P.*, 33 A.3d 73, 76 (Pa. Super. 2011). We do not conclude that that is the situation here. The trial court's findings are based on competent evidence contained in the record and its conclusions are not unreasonable.

We have reviewed the certified record, the parties' briefs, the applicable law, and the thorough, well-reasoned opinion authored by the Honorable Christopher G. Hauser of the Court of Common Pleas of McKean County, dated May 9, 2022. We conclude that Judge Hauser's opinion properly disposes of the issues presented by Mother in this appeal. Accordingly, we adopt the trial court's opinion as our own and affirm the custody order on that basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  1/26/2023

_J.C._
_____,
**Plaintiff**

vs.

_B. W._
_____,
**Defendant**

IN THE COURT OF COMMON PLEAS
OF McKEAN COUNTY, PENNSYLVANIA
CIVIL DIVISION

NO. 491 C.D. 2009

---

## 1925(a) OPINION

_J.C._
_____ (hereinafter "Mother") appeals the Trial Court's Opinion and Order dated March 24, 2022. Mother's Concise Statement of Matters Complained of on Appeal raises twelve (12) alleged errors. Mother's arguments include—but are not limited to—allegations that the Trial Court abused its discretion in awarding substantially equal custody to Mother and ___
_B.W._
_____ (hereinafter "Father"); that the Trial Court misapplied the custody factors set forth in 23 Pa.C.S.A. § 5328; and that the Trial Court abused its discretion in setting forth possible sanctions for the minor child's refusal to comply with the Custody Order. Mother essentially takes issue with every aspect of the Trial Court's Opinion and Order in this matter. For the reasons set forth herein, the Trial Court neither abused its discretion nor misapplied the law and respectfully requests its Opinion and Order dated March 24, 2022 be affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

_J.C._
1. Mother, _____, is an adult individual currently residing at 493 Interstate Parkway, Bradford, Pennsylvania, 16701. She has resided there for twelve (12) years. She
_G. B._
is thirty-five (35) years old. Mother resides with her husband, _____ (hereinafter "step-father"), her three (3) children with step-father, and B.C-W., the minor child subject to the instant appeal.

_1_

*B. W.*

2. Father, ████████████, is an adult individual currently residing at 76 Oxford Street, Bradford, Pennsylvania, 16701. He has resided there for twelve (12) years. Father is thirty-nine (39) years old. Father has one (1) other son, W.M., age fifteen (15). Pursuant to a Custody Opinion and Order entered October 5, 2016, Father has shared legal custody of W.M. and exercises custody three (3) weekends each month.

3. The parties are the natural parents of B.C-W. (hereinafter "Child"), age thirteen (13), born August ●, 2008.

4. Child has a number of mental health diagnoses which are relevant to the instant custody determination. These diagnoses include attention-deficit/hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), and general anxiety disorder.

5. This matter commenced with Mother's Amended Petition for Emergency Relief, filed August 11, 2021, which—with the agreement of both parties' counsel—was treated as a Petition to Modify Custody by Order dated October 21, 2021. On August 16, 2021, Mother filed a Petition for Appointment of Guardian *ad litem* (GAL), which the Trial Court denied.[1]

6. The October 21, 2021 Order also directed the parties to comply with the terms of their existing Custody Order. Mother did not comply.

7. On October 26, 2021, with the agreement of both parties, the Trial Court Ordered a custody evaluation and appointed Dr. Robert Maiden as Custody Evaluator. Both parties and Child were interviewed on multiple occasions, after which the Evaluator issued a Custodial Evaluation. Dr. Maiden opined it to be in Child's best interests to spend time with Father. He recommended both parties and Child should receive counseling, both as a family and

---

[1] On October 1, 2021, Plaintiff filed a Motion for Reconsideration requesting the Court reconsider appointing a GAL, which the Court denied following a hearing on October 12, 2021. Notwithstanding, the Trial Court did appoint legal counsel for Child as set forth in paragraph ten (10) of the Factual and Procedural Background.

2

separately, to improve Father and Child's relationship and with the ultimate goal of Child having "more visitations on a regular basis for a longer period." *See* Child's Ex. 1 at 13.

8. On November 30, 2021, Father filed a Petition for Civil Disobedience of Custody Order, alleging that Mother was withholding custody and that he had not seen Child since July 2021, in violation of the parties' then-current Custody Order filed November 23, 2010, and in violation of the Court's October 21, 2021 Order.[2] A hearing was held on the Petition on January 7, 2022. It was undisputed that Father had not exercised a period of physical custody since July 2021, despite numerous Court Orders directing the parties to comply with their Custody Order. Mother argued that Child refused to go to Father's periods of custody and that she could not force him. By Order dated January 10, 2022, the Trial Court deferred decision on the Petition for Civil Disobedience and issued an Interim Order to ensure Father received at least some periods of custody until the parties' custody trial. Notably, Mother presented no evidence at the hearing to establish that her violation of the Trial Court's Orders, including the parties' 2010 Custody Order, was not in bad faith, other than her own testimony and that of maternal grandmother.

9. Under the January 10, 2022 Interim Custody Order, the parties shared legal custody and Father had periods of custody two (2) times per week for a period of three (3) hours. Notably, Mother only permitted Father to exercise custody one (1) time per week.

10. Also by Order dated January 10, 2022, the Trial Court appointed legal counsel for Child, as it was clear that his wishes were a significant element of the custody determination.

---

[2] Following hearing on Mother's Petition for Special Relief, the Trial Court issued an Order dated August 9, 2021, requiring Child to continue to receive mental health treatment at the Guidance Center and directing Mother to provide Father with Child's prescriptions during his periods of custody. While the Order does not specifically direct that Father may continue to exercise his periods of custody, it is inherently obvious as the Order addresses actions to be taken while Child is in Father's care.

11. During the pendency of this litigation, Mother requested, and was granted, a total of three (3) continuances, further delaying resolution of this matter.[3]

12. Between July 2021 and January 2022, Father exercised no periods of physical custody, despite repeated efforts to do so, because Child refused to attend and Mother declined to intervene.

13. At trial, Father sought to continue the parties' existing custody arrangement, namely that he receive three (3) weekends per month with Child. Mother sought sole legal custody and sole physical custody. She proposed that Father receive no periods of custody whatsoever.

14. An expanded custody trial was held on March 3, 2022, and March 4, 2022. By Order dated March 18, 2022, the Trial Court extended the date of decision to March 25, 2022, pursuant to Pa.R.C.P. No. 1915.4(d), as the undersigned was contemporaneously preparing for a criminal jury trial and believed that additional time was necessary to ensure a well-reasoned and appropriate custody determination.

15. The parties' current Custody Order is dated March 24, 2022. Under its terms, the parties share legal and physical custody. Child resides with Mother during the week and with Father three (3) weekends per month. Child's periods of custody with Father are to coincide with his half-brother, W.M. Mother has custody on the first weekend of each month and—in months with five (5) weekends—on the fifth weekend as well.

16. On April 22, 2022, Mother filed a Notice of Appeal along with her Concise Statement of Matters Complained of on Appeal.

---

[3] *See* Plf. Motion to Continue filed September 3, 2021; *see also* Plf. Motion to Continue filed October 18, 2021; Plf. Motion to Continue filed January 6, 2022.

4

## SCOPE OF REVIEW AND APPLICABLE LAW

Appellate review of child custody orders is broad in that the appellate court is not bound by deductions and inferences drawn by the trial court from the facts found, nor is the appellate court required to accept findings of the trial court that are without support by competent evidence. *See T.M. v. H.M.*, 210 A.3d 283, 288 (Pa. Super. 2019). The appellate court is not bound by the trial court's deductions, inferences, and interpretations of the evidence. *G.A. v. D.L.*, 72 A.3d 264, 268 (Pa. Super. 2013).

The broad scope of review attendant to child custody matters does not, however, confer upon the reviewing court the license or privilege of making independent factual determinations, thereby nullifying the fact-finding function of the trial court in order to substitute its judgment for that of the trial court. *Id.* Rather, the appellate court is bound by the trial court's factual findings that are supported in the record, and must exercise its own independent deductions and inferences from facts as found by the hearing judge. *Id.* Only where the appellate court finds that a child custody order is manifestly unreasonable as shown by the evidence of record will it interfere with the trial court's determination. *See Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005). With regard to issues of credibility and weight of the evidence, when reviewing a child custody order, the superior court must defer to the presiding trial judge who viewed and assessed the witnesses firsthand. *See G.A. v. D.L.*, 72 A.3d at 268.

Therefore, an appellate court is limited to determining whether the trial court committed a clear abuse of discretion. *Id.* at 269. An abuse of discretion in the context of child custody does not consist merely of an error in judgment; it exists only when trial court overrides or misapplies the law in reaching its conclusion or when its judgment is manifestly unreasonable or the result of

5

partiality, prejudice, bias, or ill will, as shown by the evidence of record. *K.B. II v. C.B.F.*, 833 A.2d 767, 770 (Pa. Super. 2003).

## DISCUSSION

The Trial Court incorporates herein as if it had been fully set forth its Opinion and Order dated March 24, 2022, and will address each of Mother's matters complained of on appeal individually. As a preliminary matter, in cases involving *pro se* litigants, the Trial Court utilizes a custody questionnaire to assist in evaluating the sixteen (16) custody factors. These questionnaires allow the parties to submit detailed answers to questions targeted at the relevant custody factors. In cases where both parties are represented by counsel, the Trial Court allows counsel to mutually agree upon whether or not to use the questionnaire. The parties did use the questionnaire in this case, and a significant portion of the parties' testimony, as discussed in the Opinion and Order, came from the parties' answers rather than from the witness stand at trial. For example, Mother did not take the stand at trial, but submitted a detailed questionnaire, which the Trial Court treated as her testimony. For clarity of the record, the parties' questionnaires were not marked as exhibits at trial but Mother's questionnaire was considered Court Exhibit 1 and Father's Court Exhibit 2.

1. **"The trial court abused its discretion in failing to grant the Plaintiff's Amended Petition for Emergency Relief (effectively treated as a Petition for Modification of Custody) by virtue of the Court issuing a Custody Opinion and Order, which was essentially unchanged from the original 2010 Custody Order, when, through the Plaintiff's Custody Questionnaire, Exhibits and witness testimony (as well as that of the independent Custody Evaluator), evidence was presented that the Defendant abused the child, both mentally and physically, refused to engage in treatment with the child, and did not support the child's individual mental health treatment regimen."**

To begin, Mother's Amended Petition for Emergency Relief was treated as a Petition to Modify Custody following a hearing on the Petition and with the agreement of

both parties' counsel. Mother asserts that the Trial Court erred by entering an Order that was "essentially unchanged from the original 2010 Custody Order."[4] It is true that the Trial Court entered a similar Order in that the parties share legal custody and Mother has custody of Child during the week and Father receives custody three (3) weekends each month. After full consideration of all the facts, evidence, and testimony presented at trial, the Trial Court determined that the parties should share substantially equal physical custody, based upon the sixteen (16) factors set forth in 23 Pa.C.S.A. § 5328, many of which are discussed in greater detail, *infra*. The Trial Court settled on that particular schedule so that Child had consistency during the school week, meaning he did not have to spend overnights at different homes on school nights, while affording Father substantially equal custody time. Notably, the parties do not change their schedule during the summer, as would often be the case to offset one party's extra time during the school year. Furthermore, Father has custody of his other son, W.M., on most weekends; testimony showed that the boys have a close relationship, though it has suffered since Child ceased visits with Father. Additionally, it is clear that Father and Child have become estranged, and both Father and Child testified that visits between them go better when W.M. is present. By scheduling Child's time with Father to coincide with W.M.'s visits, the Trial Court intended to promote their relationship while also easing the tension between Child and Father with a neutral third party.

Mother's assertion that the evidence showed that Father abused Child physically and emotionally is untrue. The Trial Court fully considered the allegations of abuse under factor two (2) in its March 24, 2022 Opinion, and found both Child and Father's accounts of the alleged incidents to be unpersuasive. This allegation is discussed fully under

---

[4] The parties' 2010 Order was a product of their agreement and was adopted as an Order of Court by the Honorable John H. Pavlock, President Judge.

7

paragraph 2(b), *infra*.

Mother's assertion that Father refuses to participate in Child's treatment and is not supportive of his mental health regime is only partially accurate, and does not bear significantly on whether he deserves to have custody time with Child. These assertions are discussed fully under paragraph 2(c), *infra*.

2. **"With respect to the individual custody factors, pursuant to 23 Pa.C.S.A. Section 5328, the trial court, specifically, abused its discretion in finding the following:"**

   a. **"Pursuant to 23 Pa.C.S.A. Section 5328(1), the trial court abused its discretion in finding that the Defendant was more likely to encourage and permit frequent and continuing contact between the child and Plaintiff when evidence was presented through testimony, exhibits and questionnaires that (1) Plaintiff made substantial efforts to foster a relationship between the Defendant and child, and (2) Defendant frequently blamed Plaintiff for all behavioral issues of child."**

It was undisputed at trial that Father was unable to exercise a single period of custody between July 2021 and January 2022. During that time, Mother permitted Child to skip every single period of visitation with Father. She testified that she made diligent efforts to convince Child to attend, but that Child became agitated and aggressive, and refused to attend. Mr. [G.B.], Child's step-father, and Ms. [T.C.], maternal grandmother, both testified at trial that Mother tells Child he has to go to visits with Father, but did not testify to any repercussions or punishments implemented when Child refused to attend visits. In her questionnaire, Mother testified that she encourages Child to visit Father or to call him on the telephone. However, she did not testify that she imposes any punishment whatsoever for Child's refusal to visit. Furthermore, Dr. Maiden, the custody evaluator appointed in this case, testified that Mother has "undue influence" over Child. He also reported, "[Mother] said that regarding her son, he should be able to 'stay at home if he pleases. We have a safety plan.'" Child's Ex. 1

8

at 3. The parties have no such safety plan.[5] Furthermore, Mother's disinterest in promoting a relationship with Father is evidenced by her request for sole legal and physical custody. Mother wants any visitation with Father to be suspended or supervised by a therapist.

On the other hand, Father testified that in the past, Child's relationship with Mother has also been strained. There were periods of time, particularly in early 2020, when Child wanted to live primarily with Father and did not want to return to Mother's home. Father testified that he was able to convince Child to continue spending time with Mother. Now that the roles are reversed, Mother seems content to take no action to require Child to visit Father. Dr. Maiden testified at trial that Mother stated many times in her interviews that Child should not have to visit Father if he does not want to. Dr. Maiden opined that Mother needs to play a more active role in encouraging Child to see Father. The Trial Court did not find her testimony that she was helpless to make Child go to Father's to be convincing in the least. Instead, Mother was permitting Child to call the shots. Therefore, the Trial Court determined that 23 Pa.C.S.A. § 5328(a)(1) weighed in Father's favor.

    b. **"Pursuant to 23 Pa.C.S.A. Section 5328(2), the trial court abused its discretion in finding that Defendant did not act violently towards child when, through the presentation of testimony, exhibits and questionnaires, it was established that Defendant acted violently and/or aggressively with the child on more than one occasion."**

The Trial Court analyzed 23 Pa.C.S.A. §5328(a)(2) in considerable detail in its March 24, 2022 Opinion and Order, and respectfully requests that the Superior Court review its findings therein, though large portions are also set forth here. The parties became involved with McKean County Children and Youth Services (CYS) in the summer of 2021.

---

[5] A safety plan refers to the safety measures implemented by McKean County Children and Youth Services when they determine that a party presents a safety risk to a child.

> CYS received a Child Protective Services referral reporting alleged incidents of abuse perpetrated by Father against Child. CYS worker Tanner Danielson, called as a witness by both parties, testified extensively at trial regarding CYS' involvement with the parties. He testified to two (2) specific incidents [...] CYS investigated these allegations and determined them to be unfounded or invalid. Mr. Danielson specified that he determined that Father had indeed struck Child in the face, but that it was with an open hand and caused no lasting physical harm. Mr. Danielson testified that the other allegations were unsubstantiated and inconsistent. In response to a request for information submitted to CYS pursuant to 23 Pa. C.S.A. § 5329.1, the agency provided several referral forms (marked as Child's Exhibit 2). Under "present concerns" the agency states that "[Child] has mental health issues, and has made reports and it's [sic] not always [sic] been true." [...] It is unclear what exactly occurred between Father and Child which resulted in CYS' involvement but—based on the parties' testimony as well as Child's and Mr. Danielson's—Child and Father were in a disagreement on both occasions over Child's disobedience [...] Child's version of events appears exaggerated, and is not substantiated by CYS' findings. This is not intended to minimize the impact that inappropriate physical discipline can have on a child; Father must not under any circumstances cause physical harm to Child, even in an attempt to discipline him. However, the evidence does not show Father to be a danger to Child or likely to abuse or harm him.

*See* Trial Court Opinion at 10. Father testified at trial that he had never had such an altercation with Child, which the Trial Court found unpersuasive. It is clear that something occurred between Child and Father, but not to the level reported by Child. Notably, Dr. Maiden did not spend any significant time on the allegations of abuse in his report, and testified at trial that, while he had no reason to think Child was not being truthful, he may have been exaggerating the events. The Trial Court carefully considered all of the evidence and testimony and determined that Father did likely behave in an aggressive manner with Child, but that his actions were indicative of inappropriate discipline and not abuse. The Trial Court therefore included a special provision requiring the parties to mutually agree upon what discipline was appropriate and to abide by those punishments only.

10

c. "Pursuant to 23 Pa.C.S.A. Section 5328(3), the trial court abused its discretion in finding that Defendant is not unable to perform parental duties on Child's behalf when, through the presentation of testimony, exhibits and questionnaires, evidence was presented demonstrating that Defendant, unwaveringly, disagreed with child's mental health treatment and believed that child should only follow through with mental health treatment 'only if he wanted.'"

Mother next alleges that the Trial Court should have found Father to be unable to perform parental duties on Child's behalf because his opinions on mental health treatment are not the same as Mother's. First, Mother's characterization that Father has unwaveringly disagreed with Child's mental health treatment is false. Throughout this litigation, Father has repeatedly testified that he is willing to ensure Child receives his prescription medications while Child is in his care. That issue came up at the hearing on Mother's initial Petition for Emergency Relief, and the Trial Court entered an Order—which Father was agreeable to—requiring Father to administer said medications and Ordering that Child continue his mental health counseling at the Guidance Center. Father did not oppose those conditions, and only requested that the medications be provided in their labeled prescription bottles and not in an unmarked package. Since that Order, Father has not had an opportunity to comply, because Mother has continued to refuse Father custody time. Likewise, Father testified that he is willing to permit Child to continue in his mental health treatment. Dr. Maiden reported that, "The father initially had exhibited a reluctance to support recommendations that the son receive therapy and medication to treat his mental health problems. The father has since altered his position and says he supports the use of medication and therapy for his son." However, it is Father's position that Child should agree to the treatments and not be compelled to receive therapy and treatment if he does not want to. *See* Child's Ex. 1 at 12.

Just because parties do not agree does not mean that one or the other is unable to

perform parental duties on behalf of their children. The undersigned frequently encounters this concern with parents, particularly when medicating diagnoses such as ADHD. In this case, Ms. Kimberly Dietz, a nurse practitioner with the Guidance Center who oversees Child's medication regiment, testified that Father is uninvolved with Child's treatment. He has neither encouraged it nor hindered it. While Father obviously has some hesitancy regarding Child's mental health treatment, he has done nothing to impede said treatment other than opining that Child should be able to decide for himself. Based on those limited circumstances, the Trial Court did not believe Father had demonstrated any inability to perform parental duties on Child's behalf. Simply put, Child's mental health treatment was not a serious factor in this case because Father was not requesting that the Trial Court decide whether or not Child should receive mental health treatment or medication. The focus on Child's mental health was centered on whether or not it was in Child's best interest to have time with Father. Therefore, to find that Father is unable to perform parental duties based solely on Mother's concerns that it may become an issue in the future while simultaneously withholding custody of Child from Father and preventing him from even having an opportunity to perform parental duties, would have been extraordinarily unfair to Father.

> d. **"Pursuant to 23 Pa.C.S.A. Section 5328(4), the trial court abused its discretion in finding that the child's need for stability and continuity in the child's education, family life and community would not weigh in favor of Plaintiff considering that, through the presentation of witnesses, testimony and exhibits, Plaintiff provided a completely stable and prosperous environment for the child's educational, familial and community needs."**

It is true that Mother presented witnesses, testimony, and exhibits showing that she is able to provide stability and continuity in Child's education, family life, and community life. However, so did Father. In fact, any lack of stability—for example a massive deviation from the custody arrangement the parties had been following since Child was approximately two (2) years

old—was caused by Mother. Furthermore, the parties reside in the same community and Father did not seek, nor was he granted, overnight custody during the week. There would literally be no change in Child's education or community life regardless of which parent was granted primary custody. In terms of family life, both parties are perfectly able to provide stability and continuity, and both have been involved in Child's life consistently. The only significant disruption in Child's family life was, again, a result of Mother's refusal to comply with the parties' Custody Order. Therefore, the Trial Court simply does not see how it abused its discretion in finding that the factor set forth in 23 Pa.C.S.A. §5328(a)(4) weighed in neither party's favor.

e. **"Pursuant to 23 Pa.C.S.A. Section 5328(6), the trial court abused its discretion in finding that the child's sibling relationship with his half brother, W.M., was detrimentally impacted by the circumstances leading to the instant custody when the evidence, exhibits and testimony contrarily demonstrated that the brother continued to maintain a bond that was almost entirely by multimedia and electronics."**

Mother appears to be arguing that Child's relationship with W.M. is unchanged because their main bonding activity has always been through videogames. Child and W.M. like to play videogames together, and they continue to be able to do that to some extent despite Child residing with Mother. However, the Trial Court did not find that Child's relationship with W.M. was unaffected by the circumstances leading to this custody action. Conducting a sibling relationship entirely online is not a substitute for spending actual time together. "Absent compelling reasons to separate siblings, they should be reared in the same household to permit the continuity and stability necessary for a young child's development. This policy does not distinguish between half-siblings and siblings who share both biological parents." *In re H.V.*, 37 A.3d 588, 595 (Pa. Super. 2012). "The threshold for examining the meaning of compelling reasons is to ask whether the evidence indicates that it was necessary to separate the children

and whether the evidence was forceful in this regard." *L.F.F. v. P.R.F.*, 828 A.2d 1148, 1152–53 (Pa. Super. 2003). The Trial Court found no compelling reasons that Child should not spend time with W.M.; particularly as both boys testified that they loved one another and wanted to spend time together. Mother's argument that Child and W.M.'s relationship is unaffected was directly at odds with both boys' testimony. Child himself testified that he misses W.M. and wants to see him more often. Also, Child's refusal to visit Father has placed strain on his relationship with W.M., who believes Child should visit Father.

f. **"Pursuant to 23 Pa.C.S.A. Section 5328(7), the trial court abused its discretion in failing to take into consideration the well-reasoned preference of the child when the Court was able to interview the child, with counsel present, and was able to attain a well-reasoned preference for meritorious reasons for said preference."**

Mother's assertion that the Trial Court "fail[ed] to take into consideration the well-reasoned preference of the Child" is simply false. As the Superior Court will see from a review of the record in this matter, the Trial Court conducted an interview with Child, with both parties' counsel and Child's own counsel present. Child's counsel conducted the interview initially. The Trial Court then asked many questions of Child, and appropriately addressed that factor in its Opinion:

> Child is thirteen (13) years old and of average maturity and judgment for his age. Child is diagnosed with ADHD, ODD, and anxiety; he may have other mental health concerns as well. Child's mental health is discussed more fully under factor sixteen (16), *infra*. Typically, the undersigned does not reveal a child's particular preference in a written opinion for several reasons, including a desire to ensure that children speak candidly to the Court. In this case, however, Child's refusal to visit Father is the crux of this custody litigation. Both parties are fully aware that Child does not wish to reside with Father; he does not even want to see Father.
>
> Without divulging the specific contents of Child's testimony, the Court does not find Child's preference to be well-reasoned. That is not to say that Child's opinions are meritless. However, Child has taken an extreme position that is well beyond the bounds of reasonableness. It is

14

> in Child's best interests to have a relationship with both of his parents, even if Child disagrees. The Court shall consider Child's preferences when making a custody determination, but his preferences shall by no means be determinative.

Trial Court Opinion at 13-14.

> Although the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

*In re D.P.*, 972 A.2d 1221, 1232 (Pa. Super. 2009). The weight to be given to a child's preference is to be determined by the trial judge. *See Haller v. Haller*, 547 A.2d 393, 397 (Pa. Super. 1988). The Trial Court interviewed Child and found his reasoning for refusing to visit Father to be uncompelling. Child testified that his visits with Father are not very fun and that Father talks about politics too much. He testified that he does not love his Father, nor even like him. Child blamed Father for their strained relationship, just as he similarly blamed his algebra teacher for his bad mathematics grades. He told the Trial Court that he would continue to refuse to visit Father even if ordered to do so unless there were consequences. Overall, Child was immature and flippant in his interview, and provided unsatisfactory and poorly reasoned answers to many of the Trial Court's questions, particularly regarding his refusal to see Father.

The Trial Court considered his demeanor accordingly when affording appropriate weight to his preferences. Despite his refusal to visit Father, the Trial Court found that visitations with Father are in Child's best interest. *See generally In re Stuck*, 435 A.2d 219 (Pa. Super. 1981) (holding that the evidence supported expansion of father's visitation rights with his two minor daughters despite their objections to visiting). The Trial Court is confident that the interview was comprehensive and that 23 Pa.C.S.A. § 5328(a)(7) was complied with in full.

15

g. "Pursuant to 23 Pa.C.S.A. Section 5328(8), the trial court abused its discretion in finding that Plaintiff has not required the child to go with Defendant and that Plaintiff has "done absolutely nothing" to prevent the child from turning against Defendant when, through the presentation of testimony, exhibits and questionnaires, evidence was presented establishing that Plaintiff did make efforts to require the child to attend visits with Defendant and, at no time, was there any evidence presented that Plaintiff, either actively or passively, attempted to turn child against Defendant."

Mother presented no evidence that she made any efforts to prevent Child's estrangement from Father beyond telling him to attend visits. Mother's testimony was to the effect that Child simply became too upset and aggressive when forced to visit Father, so all Mother could do was ask him to go. The Trial Court found her testimony to be unpersuasive. Both Father and Dr. Maiden testified that Mother has substantial, even undue, influence over Child. Father testified that, had Mother truly encouraged Child to visit, he would have done so. Likewise, Dr. Maiden testified that Mother should take a more active role in encouraging Child to visit Father, and relayed several quotes from Mother stating that Child should not have to visit Father. The Trial Court is not suggesting that Mother lied about her attempts to convince Child to call or visit Father, but her efforts were insufficient to say the least, and the Trial Court found her testimony that she was simply helpless to do more to be unpersuasive.

h. "Pursuant to 23 Pa.C.S.A. Section 5328(9), the trial court abused its discretion in finding that both parties are equally able to maintain a loving, stable, consistent and nurturing relationship when (1) through the presentation of evidence, exhibits and testimony, evidence was presented that Plaintiff clearly provided the best environment for the child's emotional needs, and (2) even in the Court's own opinion, the Court acknowledges that Defendant's interaction with child is problematic because of Defendant's behavior."

Both parties are able to maintain a loving, stable, consistent, and nurturing relationship with Child. It is clear that Child and Father are currently at odds, but that is not the same thing as Father being unable to have a relationship with Child. He has continued, despite

16

Child's refusals, to attempt to exercise custody and to repair their relationship. Father is not perfect, and neither is Mother. Both have permitted Child to dictate the terms of his custody at various times. Father testified that in 2020 Child wanted to reside with him and not Mother, but that Mother refused to allow that. Presently, the opposite is true, but Mother is now permitting Child to dictate his custody arrangement because it is suitable to her. Obviously, there are underlying issues both between the parties and between Father and Child. Father does spend too much time talking about politics, which does not help his cause.

Furthermore, the Trial Court's Order places Child primarily with Mother during the school week, and affords the parties substantially equal custody time. Therefore, Mother's argument is not only that she is better able to maintain a loving, stable, consistent, and nurturing relationship with Child, but that she should be permitted to do so to the exclusion of Father. That position is evidenced by her request for sole legal and sole physical custody of Child. Regardless of whether this factor weighed in her favor, it certainly did not do so to the extent that Father would receive no time with Child whatsoever.

i. **"Pursuant to 23 Pa.C.S.A. Section 5328(10), the trial court abused its discretion in finding that Defendant is able to meet all of child's daily needs while in Defendant's care because there was, virtually, no evidence presented at the one and a half day custody trial indicating that Defendant was capable of doing so."**

Father has not had the opportunity to meet Child's daily needs since July 2021, as a direct result of Mother's failure to comply with their then-existing Custody Order. It is disingenuous for Mother to then argue that Father presented no evidence of his ability to do so. There was absolutely no evidence that Child's daily needs were neglected while in Father's care. The Trial Court found that this factor weighed in Mother's favor because she has been perfectly able to meet Child's daily needs, but she presented no evidence that Father could not. Father is

17

gainfully employed, has a home, and is willing and able to participate in Child's education and extracurricular activities if given the opportunity to do so.

> j. **"Pursuant to 23 Pa.C.S.A. Section 5328(13), the trial court abused its discretion in finding that Plaintiff is any source of the conflict of the parties and that Plaintiff is unwilling or unable to cooperate with Defendant regarding the child when, through the presentation of evidence, exhibits and testimony, evidence was presented that Plaintiff attempted to resolve all conflict between the parties, and to the extent that there was conflict, acted only in an effort to protect the child from further abuse by Defendant."**

Throughout this litigation, Mother has maintained that she is entirely free from wrongdoing, that she cannot have been expected to control Child's behavior, and that all conflict is Father's fault. She now appeals on this issue, seemingly asserting that the Trial Court abused its discretion by not finding that she attempted to resolve all conflict and that any conflict that did occur resulted from her effort to protect Child from Father's abuse. Mother's testimony to this effect is unpersuasive and simply does not coincide with the facts. As explicitly stated in 23 Pa. C.S.A. § 5328, a party's effort to protect a child from abuse is not evidence of unwillingness or inability to cooperate with the other party, which the Trial Court specifically noted in its Opinion. The Trial Court, after months of litigation and approximately nine (9) hours of trial, determined that Mother was in willful violation of Court Orders and that she was in civil contempt, discussed more fully, *infra*. These parties were before the Court on several occasions, and each time the Trial Court heard both parties' arguments and directed Mother to comply with the Custody Order.

> Mother has stated in text messages that she is unwilling to force Child to visit Father, and she is likewise unwilling to drive Child to Father's residence to facilitate his visits. *See* Plf. Ex. CC. Both Father and Dr. Maiden opined that Mother has substantial influence over Child; even Mother stated that she has no difficulties getting Child to do what she wants, with the exception of going to visit Father. Perhaps that is because she is not trying particularly

18

hard to get Child to go, or perhaps because there are seemingly no consequences when he refuses to go. Mother entirely allows Child to dictate the terms of his visits with Father. A few years ago, the roles were reversed, and Mother expected Father's assistance in getting Child to visit her. Now that the tables have turned, she acts as though she is unable to control Child and there is nothing she can do.

Trial Court Opinion and Order at 16-17. CYS investigated all instances of alleged abuse and returned a finding of unfounded. Mr. Danielson testified extensively as to CYS' involvement, findings, and recommendations. The Trial Court likewise does not find any physical abuse in this case. The Trial Court ultimately found that the parties' conflict was in large part Child's doing, and did not find that 23 Pa.C.S.A. § 5328(a)(13) to weigh in either party's favor.

 k. **"Pursuant to 23 Pa.C.S.A. Section 5328(14), the trial court abused its discretion in finding that Defendant's alcohol use does not pose a physical danger to the child when, through the presentation of testimony, witnesses and exhibits, evidence was presented that Defendant had a pervasive history of alcohol use, coupled with violent behavior."**

The Trial Court found that Father's alcohol abuse presented no physical danger to Child because there was absolutely no testimony or evidence to suggest otherwise. Father has never endangered or harmed Child while intoxicated. Child testified that when Father is intoxicated he is more likely to yell or argue. The Trial Court did find that Father's alcohol use may have a psychological impact on Child, and found that factor to weigh in Mother's favor. Furthermore, as discussed above, the Trial Court included a special provision in the Custody Order prohibiting Father from consuming alcohol while exercising custody. It is unclear what Mother's argument is, unless she is suggesting that Father should have no periods of custody at all due to his alcohol use, which would be a spurious argument indeed.

19

1. **"Pursuant to 23 Pa.C.S.A. Section 5328(16), the trial court abused its discretion in finding that Defendant was willing to cooperate with child's mental health treatment when, through the presentation of testimony, exhibits and witnesses, Defendant has never been supportive of the child's treatment and, even during the custody evaluation, advised Dr. Maiden that he intended to let child choose as to whether the child wanted to partake in his mental health treatment."**

Father testified at trial that he is willing to cooperate with Child's mental health treatment, including ensuring Child takes his medication. Mother is correct that Father has never been particularly supportive of Child's mental health treatment, but he has permitted Child to attend and Child has been on his mental health medication for a number of years, seemingly without incident. Mother may well be correct that Father would attempt to cease Child's treatment, but as of the time of trial he had not done so. Ms. Dietz, who has been overseeing Child's treatment since 2015, testified that she has only communicated with Father a few times, the last time being approximately a year ago in March 2021. At that time, Father called and expressed concern about Child—at that time age six (6)—being prescribed antidepressants. Ms. Dietz testified that Father agreed to consult with Child and did not refuse to permit Child to take the medication.

Mother also takes issue with Father's statement to Dr. Maiden that Child should be permitted to choose whether to receive treatment. However, Mother also believes Child should be able to choose whether to see Father, so it is unclear what decisions Mother believes Child can make and what decisions she should make for him. Child himself testified that he is not sure whether his prescribed medications help him, but that he does not mind to take them to make other people happy. Regardless, the Trial Court found that, while Father is not necessarily in favor, he is willing to acquiesce to Child's mental health treatment. Father is also willing to undergo therapy himself, either alone or with Child, but does not want Child to feel that Father

20

is forcing Child to attend the sessions with him.

3. **"The trial court abused its discretion, after analyzing the custody factors outlined in 23 Pa.C.S.A. Section 5328, in finding that the best interests of the child were served by keeping the custody arrangement essentially the same as the 2010 Custody Order."**

The Trial Court has provided is rationale for twelve (12) of the sixteen (16) custody factors in significant detail, *supra*. For the reasons set forth therein, the Trial Court did not abuse its discretion in issuing its March 24, 2022 Opinion and Order. Mother uses language which implies that the Trial Court simply recycled the parties' 2010 Order, which is a gross mischaracterization. The Order gives Mother custody during the week and Father on three (3) weekends per month; that is not a particularly unusual arrangement. Often, the undersigned would Order custody every other weekend and an evening during the week, but did not do so here because consistency is particularly important for Child given his mental health diagnoses.

Also, Father exercises custody of W.M. three (3) weekends per month also. The Trial Court considered W.M.'s schedule when fashioning its Order to ensure that Child could spend most, if not all, of his visits with W.M. Lastly, Mother's repeated contemptable behavior, discussed *infra*, seriously infringed on Father's time with Child; he is certainly entitled to makeup time. Unfortunately, the Trial Court does not believe Child is ready for long periods of time with Father, for example during the summer, and did not believe it to be in his best interests to Order makeup time in that way. In fact, each party is entitled to (two) non-consecutive weeks during the summer, and Father is limited to times when he also has custody of W.M. Therefore, for Father to have substantially equal custody of Child he should receive more than every other weekend, particularly given the continuation of the schedule during the summer months. For all of these reasons, the Trial Court set Child's schedule as it did, and certainly not merely because

21

it was the same as the 2010 Order.

4. "**The trial court abused its discretion by requiring, as a Special Provision of the Custody Order, that Plaintiff advise the child that he will be required to appear before the Court and relinquish his electronic devices when, during the custody trial, evidence was presented demonstrating that child becomes violent and/or aggressive when child is deprived of his electronics.**"

Mother's argument here appears to be that the Trial Court erred in imposing consequences on Child because Child gets fussy when deprived of his electronics. If a trial court is to be limited in its decision-making to what children want to do, that would be a severe limitation indeed. The Trial Court can find no caselaw or other legal authority showing that courts are limited in their ability to impose sanctions to only those sanctions that are pleasant or agreed upon. Mother raises several other objections to this special provision, discussed below.

5. "**The trial court, by requiring as a Special Provision that child appear before the Court and relinquish his electronic devices without a hearing, deprived the child and/or Plaintiff of his/her State and Federal Procedural Due Process rights.**"

The Trial Court's special provision does not require Child to appear before the Court to relinquish his electronic devices without a hearing. The provision states as follows:

> Mother shall advise Child of the following: Child must comply with the terms of this Court's Order. Failure to do so may result in a finding of civil contempt. Should the Court find Child in contempt, appropriate sanctions shall be imposed. For example, if Child refuses to attend a visitation with Father, Child shall be Ordered to appear before the Court and relinquish his electronic devices— including, but not limited to—his Xbox, Nintendo Switch, or PlayStation, to the Court for a period of not less than thirty (30) days.

Trial Court Opinion and Order at 23 (paragraph 8(e)). Nowhere in this provision does the Trial Court state that it will restrict Child's electronic privileges without a hearing. The Trial Court is very familiar with contempt proceedings; it cannot—and would not—make a finding of civil contempt without a full hearing following the issuance of a rule to show cause. The willful

22

disregard of custody orders has traditionally been subject to the court's contempt powers. *See generally Knaus v. Knaus*, 127 A.2d 669 (Pa. 1956). "The purpose of a civil contempt proceeding is remedial, and judicial sanctions are employed (1) to coerce the defendant into compliance with the court's order, and (2) in some instances to compensate the complainant for losses sustained." *Id.* at 672. In this case, the purpose of a contempt proceeding would be to ensure Child's compliance with a Court Order. The Trial Court implemented this special provision for several specific purposes. First, Mother repeatedly testified that she is unable or unwilling to make Child visit Father, meaning she believes herself incapable of compelling compliance with the Trial Court's Order. So, Mother would have the Trial Court enter an Order knowing it would not be complied with. Either she can parent Child or she cannot. If the Trial Court takes her testimony as credible then she cannot, and it is necessary for the Trial Court to intervene. If the Trial Court does not find her to be credible—which is the case here—then she is going to ignore the Order regardless and a potential sanction for both her and Child is necessary.

Following trial, the Trial Court determined that it was definitely in Child's best interests to have visitation with Father; in fact, the Trial Court found Father to be an equally fit parent, and awarded substantially equal custody. Mother has already demonstrated her willingness to defy Court Orders. Second, Child himself told the Trial Court that he would not comply with a Court Order requiring him to visit Father, unless there were consequences for himself or Mother. Third, Father testified several times that he is concerned that Child will only become more alienated if Father attempts to force them to spend time together or to attend counseling or therapy together. Father testified that he fears Child will resent him if he pushes the issue; already Child refuses to visit and never reaches out via telephone or text, and Father does not want their relationship to

23

deteriorate further. This is a reasonable concern, as Child is currently very against attending therapy or visits with Father.

The Trial Court recognizes that Child's ODD diagnosis plays some role in his attitude and behavior toward Father. Mother has only made it worse by caving to his demands and refusing to be the authority in the home. The Trial Court sincerely doubts that Mother is going to miraculously change her attitude at this point. Therefore, the Trial Court determined that the only way to ensure compliance with its Order was to set forth some sanctions which would directly impact Child.[6] In this case, the evidence showed that Child's main hobby is online gaming, and that he spends a significant amount of time each day online. The purpose of the special provision at issue here is to put Child on notice that his actions have consequences; while he may be able to exert control over his parents, he cannot defy Court Orders without repercussions. The Trial Court believes its rationale in this decision was sound, and was the best way to impress upon Child that he must visit Father or face unappealing consequences.

Regarding Mother's argument that these sanctions would be imposed without a hearing, that is not true. The Trial Court would absolutely hold a hearing prior to imposing any sanctions, and would afford Child an opportunity to purge the contempt by visiting Father. Therefore, the argument lacks merit.

6. **"The trial court, by requiring child to appear before the Court to relinquish his property for failing to visit with his Father without any indication that he will be provided counsel in such event, is a violation of the child's state and federal constitutional rights to counsel."**

To begin, this issue is not yet ripe and is therefore not justiciable. "Issues of justiciability are a threshold matter generally resolved before addressing the merits of the parties' dispute."

---

[6] The Trial Court also set forth a minimum fine of $200.00 for Mother's failure to comply. Trial Court Opinion and Order at 23 (paragraph 8(g)).

*Robinson Twp., Washington Cty. v. Com.*, 83 A.3d 901, 917 (Pa. 2013). The Trial Court has held no contempt hearing in this matter, and therefore Child's right to counsel has not been violated, nor is there any indication that it would be. By asking the Superior Court to find an abuse of discretion without any facts upon which to base that finding is akin to requesting an advisory opinion. *Id.* at 917.

Notably, the Trial Court has already appointed legal counsel for Child. Counsel was present at trial and conducted direct and cross examination on Child's behalf. Counsel also conducted Child's *in camera* interview. Counsel withdrew his appearance following the final determination in this case, but the Trial Court would certainly reappoint him, or appoint different counsel, if the need arose. However, the Trial Court cannot defend procedure which has not yet occurred, and respectfully requests the Superior Court to find this issue not ripe at this time.

7. **"The trial court abused its discretion in issuing contempt sanctions for a non-party, i.e. a thirteen year old child."**

The Trial Court did not abuse its discretion in setting forth possible contempt sanctions for Child's failure to comply with an Order of Court.[7]

> Every court shall have power to issue, under its judicial seal, every lawful writ and process necessary or suitable for the exercise of its jurisdiction and for the enforcement of any order which it may make and all legal and equitable powers required for or incidental to the exercise of its jurisdiction, and, except as otherwise prescribed by general rules, every court shall have power to make such rules and orders of court as the interest of justice or the business of the Court may require.

42 Pa. C.S.A. § 323. The Superior Court, in *In Interest of Crawford,* held that 42 Pa. C.S.A. § 323 does apply to juveniles, irrespective of the separate provisions of the Juvenile Act. Therefore, it

---

[7] Mother phrases this alleged error as though the Trial Court has issued contempt sanctions upon Child already. That is a misstatement of the facts, as no contempt proceedings regarding Child have been initiated and the Trial Court has imposed no sanctions whatsoever on Child.

25

was within the Trial Court's authority to include possible contempt sanctions for Child. *In Int. of Crawford*, 519 A.2d 978, 980 (Pa. Super. 1987).

Further, as stated above, the Trial Court has not issued any contempt sanctions on Child, and therefore could not have abused its discretion in doing so. The Trial Court is unable to set forth any analysis on this issue because it has not occurred. In the event Child fails to comply with the Court's March 24, 2022 Opinion and Order, the Trial Court will take appropriate action at that time.

8. **"The trial court abused its discretion in finding that it was in the best interests of the child to create unconstitutional sanctions against a non-party while failing to levy any requirements upon Defendant, apart from requiring Defendant to enroll in anger management with absolutely no requirement that Defendant provide proof to the Court and/or the parties of his compliance."**

Mother's argument here is that the Trial Court abused its discretion by imposing potential sanctions on Child but not on Father. After diligent search the Trial Court can find no caselaw or legal authority suggesting that sanctions have to be evenly imposed such that everyone involved has the same number, nor does the Trial Court believe that to be a sound legal argument. The parties themselves should be well aware that the Trial Court can impose civil sanctions if they are found to be in contempt of court. If Father fails to enroll in anger management, he may be subject to sanctions. If Mother's argument is that the Trial Court abused its discretion by not requiring Father to provide proof of his counseling to the Court or to Mother, then the Trial Court asserts that is certainly not an abuse of discretion. Even if it were somehow erroneous, it would be a harmless error, as the Trial Court could simply direct Father to submit that information at a later time, in the event it becomes an issue. It is illogical to compare the potential sanctions set forth in the Order to whether or not Father has to provide documents to the Trial Court; there is simply no relation between those two provisions, and the Trial Court

26

fails to see how this is relevant, or even what argument Mother is trying to make.

9. **"The trial court abused its discretion in finding that it was in the best interests of the child to resume contact with Defendant without Defendant being required to undergo a drug and evaluation and to comply with any treatment requirements."**

First, there was absolutely no evidence presented at trial that Father abused drugs and therefore it would have been completely arbitrary for the Trial Court to require him to receive a drug evaluation. Based on the phrasing of the alleged error, the Trial Court assumes, *arguendo*, that Mother also intended to refer to an alcohol evaluation, as there was evidence at trial that Father consumes alcohol, sometimes to the point of intoxication. Father has a history of alcohol-related offenses, such as public drunkenness, DUI, and disorderly conduct, and Mother believes that Father poses a danger to Child as a result, despite providing no evidence whatsoever to support that argument.

There was no evidence at trial that Father ever harmed or endangered Child as a result of alcohol use. Based on the testimony at trial, the Trial Court found that Father drinks socially, sometimes to the point of intoxication. Regardless, the Trial Court, after considering Father's criminal history and based on the testimony at trial, placed a special provision in its Order which states that, "Father shall not consume alcohol during his periods of physical custody or for a period of twenty-four (24) hours in advance of his period of custody." *See* Custody Order at paragraph 8. The Trial Court believes that prohibiting Father from consuming any alcohol whatsoever during his periods of custody obviates the need for Father to receive a drug and alcohol evaluation and it is unclear why Mother is appealing this point. Prohibiting Father from consuming alcohol during a period of custody is a significantly more stringent imposition than requiring an evaluation. Notably, Father is not appealing the Trial Court's imposition of this requirement, though it would make far more sense for him to do so.

27

10. **"The trial court abused its discretion in prohibiting Plaintiff's mother from attending custody exchanges when, through the presentation of evidence at trial, evidence was presented that Plaintiff's mother was an important member of Plaintiff's family that assisted Plaintiff in encouraging child to visit with Defendant."**

The evidence presented at trial did not establish that maternal grandmother played any notable role in assisting Mother in encouraging Child to visit Father. First, and most obviously, Child has patently refused to see Father throughout the pendency of this litigation. Therefore, whatever efforts maternal grandmother is making to convince Child to visit Father were unsuccessful. Furthermore, the Trial Court was somewhat wary of maternal grandmother's testimony that she attends every single exchange. Maternal grandmother lives across the street from Mother, and testified that since July 2021 she has not missed an exchange. Obviously, maternal grandmother's presence has done nothing to facilitate Child going with Father. Instead, by attending every exchange, maternal grandmother may be signaling to Child an attitude of confrontation. Mother has demonstrated that she will take unnecessary and passive aggressive measures when Father arrives to pick up Child, such as posting no trespassing signs on her property. To that end, Father is worried that if he pulls into her driveway, Mother may call the police, creating further strife. Maternal grandmother expressed her concerns about Child visiting Father and clearly does not have a positive opinion of him. The Trial Court believes that, in this case, third parties should not be present at the custody exchange unless they are there to facilitate the exchange or are otherwise neutral.

11. **"The trial court abused its discretion in disregarding, almost completely, the report and the testimony of the custody evaluator, Dr. Robert Maiden, in forming its opinion."**

The Trial Court did not disregard the report and testimony or Dr. Maiden. In fact, the Trial Court relied significantly on Dr. Maiden's findings and opinions. Dr. Maiden is a well-

28

respected custody evaluator, and the Trial Court recognizes his expertise in these matters. Dr. Maiden's Custodial Evaluation was admitted into evidence as Child's Ex. 1 at trial, and Dr. Maiden testified expansively. While the Trial Court may not directly quote Dr. Maiden's report extensively in its Opinion and Order, that is not to say that great weight was not placed on his professional recommendations. In fact, Dr. Maiden's Custodial Evaluation and testimony played a significant part in the Trial Court's ultimate decision, though the Trial Court Ordered a different custodial arrangement than Dr. Maiden recommended.

In his report, Dr. Maiden stated that "The son offers no explanation for why he refused to visit with his father [...] Or he says adamantly he does not want to be with his father." Child. E. 1 at 12. "It is interesting that both the son and the father are alike in that they are adamantly opposed to being forced to do something they don't want to do." *Id.* at 13. "I suggested that we leave those issues no matter what had occurred in the past and to start fresh." *Id.* "[Child and W.M.] get along well. So, this may also be a possible a [sic] way to try to bring the family together if some of the visits including [sic] [W.M.] if that would help the son to feel more comfortable." *Id.* Dr. Maiden recommended that Father receive anger management counseling, that Mother receive counseling on authoritative parenting, and that the parties and Child engage in individual and family counseling. *Id.* at 14. Dr. Maiden found that Mother "tends to want to be in control and may overreach at times." *Id.* at 3. "The mother believes she needs to 'have control over their son's medical needs.'" *Id.*

Regarding Child, Dr. Maiden stated

> There seem to be two pictures of his behavior. His mother seemed to perceive a lot of autistic behaviors in [Child], whereas the teachers found him to be normal. The report also indicated that focusing and attending to information was one of [Child's] strengths while at the same time he is diagnosed with attention deficit disorder."

*Id.* at 6. Dr. Maiden further questioned whether Child has ADHD, which somewhat supports Father's concerns that Child does not need medication, at least in that regard. *See Id.* Also, "Lately, [Child] has been visiting with his father for three-hour stints. This experience has had its problems, but overall, it appears as though it is working." *Id.* at 7.

[FATHER]

> The mother is correct that it is likely that father goes on rants regarding political issues, something that probably his son being 13 is not interested in. ████████ actually exhibited this tendency to me when we reviewed his scores on the MMPI-II. This creates problems and it also appears in my opinion as though ████████ [FATHER] has the potential to be forceful when his son becomes stubborn and obstinately [sic] and refuses to do comply [sic] with what he is asked to do. It also appears as though the mother does influence their son to do what she thinks is appropriate and correct over what his father wants.

*Id.* at 10-11. Dr. Maiden recommended that Father not consume alcohol during periods of custody and that he not use physical punishment. *Id.* at 11. The Trial Court took all of these considerations, as well as Dr. Maiden's testimony at trial, into consideration when making its own findings and fashioning the March 24, 2022 Order.

The Trial Court did choose not to follow some of Dr. Maiden's recommendations. For example, Dr. Maiden recommended that Child not have overnight periods of custody with Father initially, and that they continue to follow the January 10, 2022 Interim Order. However, Dr. Maiden also testified that when forming his opinions he generally takes the parties' self-reporting as true, and does not delve into whether they are being untruthful or manipulative.

12. **"The trial court abused its discretion in granting Defendant's Petition for Civil Disobedience of a Custody Order when, through evidence presented at trial, Defendant failed to establish that the Plaintiff willfully violated the custody order with any wrongful intent."**

The Trial Court did not abuse its discretion in granting Father's Petition for Civil

30

Disobedience. In fact, the Trial Court gave Mother numerous opportunities to comply with the parties' Custody Order and she chose not to do so. In order to make a finding of civil contempt, the following elements must be met: (1) the Order must be clear and specific such that it leaves no doubt or uncertainty of the conduct required or prohibited; (2) the contemnor must have notice of the specific Order; (3) the act constituting the violation must have been volitional; and (4) the contemnor must have acted with wrongful intent. *See Sutliff v. Sutliff*, 522 A.2d 80, 83-84. (Pa. Super. 1987). All of those elements were met. First, the Custody Order was extremely clear. Father was to have three (3) periods of weekend custody each month. Second, Mother obviously was aware of the parties' 2010 Custody Order, and at no point at any hearing did she allege that she was not aware of its terms; also, the undersigned specifically directed her—in person—on several occasions that she was to comply with the Custody Order. Third, Mother intentionally did not require Child to visit Father. She stated that Child should not have to visit Father, and on at least one occasion placed no trespassing signs at her property and threatened Father with police involvement if he did not leave her residence, where he was trying to pick up Child. Mother has demonstrated a total disregard for Court Orders. Finally, the Trial Court found that Mother acted with wrongful intent. Notably, the Trial Court deferred decision on the Petition until after trial because Mother failed to present any evidence of abuse at the initial hearing on the Petition. The Trial Court could have found her in contempt at that point, but chose to wait before deciding that her actions were conducted with wrongful intent.

Following trial, it was clear that there has been only one notable incident between Child and Father. The evidence showed that Father may have struck Child with an open hand. CYS determined the case to be unfounded and took no further action. The Trial Court has heard these allegations repeatedly since the filing of the Petition for Emergency Custody and has found

31

them to be baseless. Mother has been told, by the Trial Court both in person and via Order, that she must follow the parties' Custody Order.

> Each court is the exclusive judge of contempts against its process. The contempt power is essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute. When reviewing an appeal from a contempt order, the appellant court must place great reliance upon the discretion of the trial judge.

*Langendorfer v. Spearman*, 797 A.2d 303, 307 (Pa. Super. 2002). Here, Mother has blatantly and repeatedly ignored the Trial Court's Orders. Father has repeatedly asked the Trial Court to enforce the parties' Custody Order, and the Trial Court refrained from imposing sanctions, instead directing Mother to comply. Notably, even after the filing of this Petition for Civil Disobedience, Mother continued to violate the Order. She also violated the January 10, 2022 Interim Order. The Trial Court finds that Mother intentionally and wrongfully violated Court Orders for approximately six (6) months.

The Trial Court believes that Mother simply does not want to comply with the Court's directives, and believes she can avoid doing so. She may well be attempting to delay further with the filing of the instant appeal. Regardless, the Trial Court gave Mother every possible opportunity to purge herself of the contempt, and she chose not to do so. Finally, the sanction imposed by the Trial Court in consideration of her contempt was an extremely mild one. Mother was directed to pay the costs associated with the Petition, including costs associated with its preparation, filing, and argument. The sanction was in no way punitive, and instead merely offset a portion of the expense Father has gone to in litigating her contempt.

32

# CONCLUSION

For the reasons stated above, the Trial Court respectfully requests that its Opinion and Order dated March 24, 2022, be affirmed.

**RESPECTFULLY SUBMITTED:**

_____ 5/9/2022

**CHRISTOPHER G. HAUSER, J.**       Date

CE: C. Martini
    G. Henry

CC: FLM   (5-9-22)

Certification

I hereby certify the within to be a true & correct copy thereof as filed in the office of the Prothonotary of McKean County, Pennsylvania.

_____
                    Prothonotary

33